

FILED
IN OPEN COURT

FEB 2 2 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO.  1:18 Cr. 83 (TSE)(S-1) |
| v. | **COUNTS 1–5**: 26 U.S.C. § 7206(1); 18 U.S.C. §§ 2 and 3551 et seq. Subscribing to False United States Individual Income Tax Returns |
| PAUL J. MANAFORT, JR., (Counts 1 through 5, 11 through 14, and 24 through 32) | **COUNTS 6–10**: 26 U.S.C. § 7206(2); 18 U.S.C. § 3551 et seq. Assisting in the Preparation of False United States Individual Income |
| and | **COUNTS 11–14**:  31 U.S.C. §§ 5314 and 5322(a); 18 U.S.C. §§ 2 and 3551 et seq. Failure To File Reports Of Foreign Bank And Financial Accounts |
| RICHARD W. GATES III, (Counts 6 through 10 and 15 through 32) | |
| Defendants. | **COUNTS 15–19**:  26 U.S.C. § 7206(1); 18 U.S.C. §§ 2 and 3551 et seq. Subscribing to False United States Individual Income Tax Returns |
| | **COUNT 20**: 26 U.S.C. § 7206(1); 18 U.S.C. §§ 2 and 3551 et seq. Subscribing to a False Amended United States Individual Income Tax Return |
| | **COUNTS 21–23**: 31 U.S.C. §§ 5314 and 5322(a); 18 U.S.C. §§ 2 and 3551 et seq. Failure To File Reports Of Foreign Bank And Financial Accounts |
| | **COUNT 24**: 18 U.S.C. §§ 1349 and 3551 et seq. Bank Fraud Conspiracy |
| | **COUNT 25**: 18 U.S.C. §§ 1344, 2, and 3551 et seq. Bank Fraud |

```
*        COUNT 26: 18 U.S.C. §§ 1349 and 3551
*        et seq.
*        Bank Fraud Conspiracy
*
*        COUNTS 27: 18 U.S.C. §§ 1344, 2, and
*        3551 et seq.
*        Bank Fraud
*
*        COUNT 28–29: 18 U.S.C. §§ 1349 and
*        3551 et seq.
*        Bank Fraud Conspiracy
*
*        COUNT 30: 18 U.S.C. §§ 1344, 2, and
*        3551 et seq.
*        Bank Fraud
*
*        COUNT 31: 18 U.S.C. §§ 1349 and 3551
*        et seq.
*        Bank Fraud Conspiracy
*
*        COUNT 32: 18 U.S.C. §§ 1344, 2, and
*        3551 et seq.
*        Bank Fraud
*
*        FORFEITURE NOTICE
*
*
*******
```

## SUPERSEDING INDICTMENT

### February 2018 Term – At Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### Introduction

At all times relevant to this Superseding Indictment:

1.    Defendants PAUL J. MANAFORT, JR. (MANAFORT) and RICHARD W. GATES III

(GATES) served for years as political consultants and lobbyists.  Between at least 2006 and 2015,

2

MANAFORT and GATES acted as unregistered agents of a foreign government and foreign political parties. Specifically, they represented the Government of Ukraine, the President of Ukraine (Victor Yanukovych, who was President from 2010 to 2014), the Party of Regions (a Ukrainian political party led by Yanukovych), and the Opposition Bloc (a successor to the Party of Regions after Yanukovych fled to Russia).

2. MANAFORT and GATES generated tens of millions of dollars in income as a result of their Ukraine work. From approximately 2006 through the present, MANAFORT and GATES engaged in a scheme to hide income from United States authorities, while enjoying the use of the money. During the first part of the scheme between approximately 2006 and 2015, MANAFORT, with GATES' assistance, failed to pay taxes on this income by disguising it as alleged "loans" from nominee offshore corporate entities and by making millions of dollars in unreported payments from foreign accounts to bank accounts they controlled and United States vendors. MANAFORT also used the offshore accounts to purchase United States real estate, and MANAFORT and GATES used the undisclosed income to make improvements to and refinance their United States properties.

3. In the second part of the scheme, between approximately 2015 and at least January 2017, when the Ukraine income dwindled after Yanukovych fled to Russia, MANAFORT, with the assistance of GATES, extracted money from MANAFORT's United States real estate by, among other things, using those properties as collateral to obtain loans from multiple financial institutions. MANAFORT and GATES fraudulently secured more than twenty million dollars in loans by falsely inflating MANAFORT's and his company's income and by failing to disclose existing debt in order to qualify for the loans.

4. In furtherance of the scheme, MANAFORT and GATES funneled millions of dollars in

3

payments into numerous foreign nominee companies and bank accounts, opened by them and their accomplices in nominee names and in various foreign countries, including Cyprus, Saint Vincent & the Grenadines (Grenadines), and the Seychelles. MANAFORT and GATES hid the existence and ownership of the foreign companies and bank accounts, falsely and repeatedly reporting to their tax preparers and to the United States that they had no foreign bank accounts.

5.      In furtherance of the scheme, MANAFORT used his hidden overseas wealth to enjoy a lavish lifestyle in the United States, without paying taxes on that income. MANAFORT, without reporting the income to his tax preparer or the United States, spent millions of dollars on luxury goods and services for himself and his extended family through payments wired from offshore nominee accounts to United States vendors. MANAFORT also used these offshore accounts to purchase multi-million dollar properties in the United States and to improve substantially another property owned by his family.

6.      In furtherance of the scheme, GATES used millions of dollars from these offshore accounts to pay for his personal expenses, including his mortgage, children's tuition, and interior decorating and refinancing of his Virginia residence.

7.      In total, more than $75,000,000 flowed through the offshore accounts. MANAFORT, with the assistance of GATES, laundered more than $30,000,000, income that he concealed from the United States Department of the Treasury (Treasury), the Department of Justice, and others. GATES obtained more than $3,000,000 from the offshore accounts, income that he too concealed from the Treasury, the Department of Justice, and others.

4

## Relevant Individuals And Entities

8.     MANAFORT was a United States citizen.  He resided in homes in Virginia, Florida, and Long Island, New York.

9.     GATES was a United States citizen.  He resided in Virginia.

10.    In 2005, MANAFORT and another partner created Davis Manafort Partners, Inc. (DMP) to engage principally in political consulting.  DMP had staff in the United States, Ukraine, and Russia.  In 2011, MANAFORT created DMP International, LLC (DMI) to engage in work for foreign clients, in particular political consulting, lobbying, and public relations for the Government of Ukraine, the Party of Regions, and members of the Party of Regions.  DMI was a partnership solely owned by MANAFORT and his spouse.  GATES worked for both DMP and DMI and served as MANAFORT's right-hand man.

11.    The Party of Regions was a pro-Russia political party in Ukraine.  Beginning in approximately 2006, it retained MANAFORT, through DMP and then DMI, to advance its interests in Ukraine, the United States, and elsewhere, including the election of its slate of candidates.  In 2010, its candidate for President, Yanukovych, was elected President of Ukraine. In 2014, Yanukovych fled Ukraine for Russia in the wake of popular protests of widespread governmental corruption.  Yanukovych, the Party of Regions, and the Government of Ukraine were MANAFORT, DMP, and DMI clients.

12.    MANAFORT and GATES owned or controlled the following entities, which were used in the scheme (the MANAFORT–GATES entities):

### Domestic Entities

| Entity Name | Date Created | Incorporation Location |
| --- | --- | --- |
| Bade LLC (RG) | January 2012 | Delaware |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Daisy Manafort, LLC (PM) | August 2008 | Virginia |
| | March 2011 | Florida |
| Davis Manafort International LLC (PM) | March 2007 | Delaware |
| DMP (PM) | March 2005 | Virginia |
| | March 2011 | Florida |
| Davis Manafort, Inc. (PM) | October 1999 | Delaware |
| | November 1999 | Virginia |
| DMI  (PM) | June 2011 | Delaware |
| | March 2012 | Florida |
| Global Sites LLC (PM, RG) | July 2008 | Delaware |
| Jemina LLC (RG) | July 2008 | Delaware |
| Jesand Investment Corporation (PM) | April 2002 | Virginia |
| Jesand Investments Corporation (PM) | March 2011 | Florida |
| John Hannah, LLC (PM) | April 2006 | Virginia |
| | March 2011 | Florida |
| Jupiter Holdings Management, LLC (RG) | January 2011 | Delaware |
| Lilred, LLC (PM) | December 2011 | Florida |
| LOAV Ltd. (PM) | April 1992 | Delaware |
| MC Brooklyn Holdings, LLC (PM) | November 2012 | New York |
| MC Soho Holdings, LLC (PM) | January 2012 | Florida |
| | April 2012 | New York |
| Smythson LLC (also known as Symthson LLC) (PM, RG) | July 2008 | Delaware |

6

### Cypriot Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Actinet Trading Limited (PM, RG) | May 2009 | Cyprus |
| Black Sea View Limited (PM, RG) | August 2007 | Cyprus |
| Bletilla Ventures Limited (PM, RG) | October 2010 | Cyprus |
| Cavenari Investments Limited (RG) | December 2007 | Cyprus |
| Global Highway Limited (PM, RG) | August 2007 | Cyprus |
| Leviathan Advisors Limited (PM, RG) | August 2007 | Cyprus |
| LOAV Advisors Limited (PM, RG) | August 2007 | Cyprus |
| Lucicle Consultants Limited (PM, RG) | December 2008 | Cyprus |
| Marziola Holdings Limited (PM) | March 2012 | Cyprus |
| Olivenia Trading Limited (PM, RG) | March 2012 | Cyprus |
| Peranova Holdings Limited (Peranova) (PM, RG) | June 2007 | Cyprus |
| Serangon Holdings Limited (PM, RG) | January 2008 | Cyprus |
| Yiakora Ventures Limited (PM) | February 2008 | Cyprus |

### Other Foreign Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Global Endeavour Inc. (also known as Global Endeavor Inc.) (PM) | *Unknown* | Grenadines |
| Jeunet Ltd. (PM) | August 2011 | Grenadines |
| Pompolo Limited (PM, RG) | April 2013 | United Kingdom |

7

13.   The Internal Revenue Service (IRS) was a bureau in the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the Treasury.

### The Tax Scheme

MANAFORT And GATES' Wiring Money From Offshore Accounts Into The United States

14.   In order to use the money in the offshore nominee accounts of the MANAFORT–GATES entities without paying taxes on it, MANAFORT and GATES caused millions of dollars in wire transfers from these accounts to be made for goods, services, and real estate.  They did not report these transfers as income.

15.   From 2008 to 2014, MANAFORT caused the following wires, totaling over $12,000,000, to be sent to the vendors listed below for personal items.  MANAFORT did not pay taxes on this income, which was used to make the purchases.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| Vendor A (Home Improvement Company in the Hamptons, New York) | 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| | 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| | 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| | 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| | 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| | 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |
| | 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| | 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| | 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |
| | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| | 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| | 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |

8

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| | 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| | 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| | 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| | 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| | 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| | 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| | 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |
| | 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |
| | 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| | 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 3/28/2012 | Peranova | Cyprus | $37,500 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| | 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| | 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| | 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| | 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| | 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| | 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |
| | 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| | 4/22/2014 | Global Endeavour Inc. | Grenadines | $56,293 |
| | 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| | | | **Vendor A Total** | **$5,434,793** |
| **Vendor B** (Home Automation, Lighting and Home Entertainment Company in Florida) | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $17,006 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $11,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $6,200 |
| | 10/31/2012 | Lucicle Consultants Limited | Cyprus | $290,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $160,600 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $194,000 |
| | 1/24/2013 | Lucicle Consultants Limited | Cyprus | $6,300 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $51,600 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $260,000 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $175,575 |
| | 11/5/2013 | Global Endeavour Inc. | Grenadines | $73,000 |
| | | | **Vendor B Total** | **$1,319,281** |
| **Vendor C** (Antique Rug Store in Alexandria, Virginia) | 10/7/2008 | Yiakora Ventures Limited | Cyprus | $15,750 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $46,200 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $7,400 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $65,000 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $210,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 7/15/2009 | Yiakora Ventures Limited | Cyprus | $200,000 |
| | 3/31/2010 | Yiakora Ventures Limited | Cyprus | $140,000 |
| | 6/16/2010 | Global Highway Limited | Cyprus | $250,000 |
| | | | **Vendor C Total** | **$934,350** |
| **Vendor D** (Related to Vendor C) | 2/28/2012 | Global Highway Limited | Cyprus | $100,000 |
| | | | **Vendor D Total** | **$100,000** |
| **Vendor E** (Men's Clothing Store in New York) | 11/7/2008 | Yiakora Ventures Limited | Cyprus | $32,000 |
| | 2/5/2009 | Yiakora Ventures Limited | Cyprus | $22,750 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $13,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $32,500 |
| | 3/30/2010 | Yiakora Ventures Limited | Cyprus | $15,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $39,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $32,500 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $11,500 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $24,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $43,600 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $3,000 |
| | 6/30/2011 | Global Highway Limited | Cyprus | $24,500 |
| | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $26,700 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $46,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,800 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $16,000 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $8,000 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $48,550 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $21,600 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $15,500 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $10,900 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $37,000 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $39,000 |
| | 9/3/2013 | Global Endeavour Inc. | Grenadines | $81,500 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 10/15/2013 | Global Endeavour Inc. | Grenadines | $53,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $13,200 |
| | 4/24/2014 | Global Endeavour Inc. | Grenadines | $26,680 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $58,435 |
| | | | **Vendor E Total** | **$849,215** |
| **Vendor F** (Landscaper in the Hamptons, New York) | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $34,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $45,700 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $21,500 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $29,000 |
| | 9/21/2009 | Yiakora Ventures Limited | Cyprus | $21,800 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $44,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $19,000 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $21,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $57,700 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $26,000 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $20,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $40,000 |
| | 6/1/2011 | Leviathan Advisors Limited | Cyprus | $44,000 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $27,000 |
| | 8/16/2011 | Leviathan Advisors Limited | Cyprus | $13,450 |
| | 9/19/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $42,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $37,350 |
| | | | **Vendor F Total** | **$655,500** |
| **Vendor G** (Antique Dealer in New York) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $165,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $165,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $190,600 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $75,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $28,310 |
| | | | **Vendor G Total** | **$623,910** |
| **Vendor H** (Clothing Store in Beverly Hills, California) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $52,000 |
| | 12/16/2008 | Yiakora Ventures Limited | Cyprus | $49,000 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $10,260 |
| | 8/12/2009 | Yiakora Ventures Limited | Cyprus | $76,400 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $85,000 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $128,280 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $64,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $48,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | | | **Vendor H Total** | **$520,440** |
| Vendor I (Investment Company) | 9/3/2013 | Global Endeavour Inc. | Grenadines | $500,000 |
| | | | **Vendor I Total** | **$500,000** |
| Vendor J (Contractor in Florida) | 11/15/2011 | Global Highway Limited | Cyprus | $8,000 |
| | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $11,237 |
| | 12/21/2011 | Black Sea View Limited | Cyprus | $20,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $51,000 |
| | 5/17/2012 | Lucicle Consultants Limited | Cyprus | $68,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $60,000 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $32,250 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $112,000 |
| | 11/30/2012 | Lucicle Consultants Limited | Cyprus | $39,700 |
| | 1/9/2013 | Lucicle Consultants Limited | Cyprus | $25,600 |
| | 2/28/2013 | Lucicle Consultants Limited | Cyprus | $4,700 |
| | | | **Vendor J Total** | **$432,487** |
| Vendor K (Landscaper in the Hamptons, New York) | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $4,115 |
| | 3/1/2012 | Global Highway Limited | Cyprus | $50,000 |
| | 6/6/2012 | Lucicle Consultants Limited | Cyprus | $47,800 |
| | 6/25/2012 | Lucicle Consultants Limited | Cyprus | $17,900 |
| | 6/27/2012 | Lucicle Consultants Limited | Cyprus | $18,900 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $3,300 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $13,325 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $9,400 |
| | | | **Vendor K Total** | **$164,740** |
| Vendor L (Payments Relating to Three Range Rovers) | 4/12/2012 | Lucicle Consultants Limited | Cyprus | $83,525 |
| | 5/2/2012 | Lucicle Consultants Limited | Cyprus | $12,525 |
| | 6/29/2012 | Lucicle Consultants Limited | Cyprus | $67,655 |
| | | | **Vendor L Total** | **$163,705** |
| Vendor M | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 12/7/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Contractor in Virginia) | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 1/17/2013 | Lucicle Consultants Limited | Cyprus | $18,750 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $9,400 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $10,500 |
| | | | **Vendor M Total** | **$125,650** |
| **Vendor N** (Audio, Video, and Control System Home Integration and Installation Company in the Hamptons, New York) | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $21,725 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $24,650 |
| | 12/2/2009 | Global Highway Limited | Cyprus | $10,000 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $20,300 |
| | 4/23/2010 | Yiakora Ventures Limited | Cyprus | $8,500 |
| | 7/29/2010 | Leviathan Advisors Limited | Cyprus | $17,650 |
| | | | **Vendor N Total** | **$112,825** |
| **Vendor O** (Purchase of Mercedes Benz) | 10/5/2012 | Lucicle Consultants Limited | Cyprus | $62,750 |
| | | | **Vendor O Total** | **$62,750** |
| **Vendor P** (Purchase of Range Rover) | 12/30/2008 | Yiakora Ventures Limited | Cyprus | $47,000 |
| | | | **Vendor P Total** | **$47,000** |
| **Vendor Q** (Property Management Company in South Carolina) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $10,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $10,000 |
| | 2/8/2011 | Global Highway Limited | Cyprus | $13,500 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,500 |
| | | | **Vendor Q Total** | **$46,000** |
| **Vendor R** (Art Gallery in Florida) | 2/9/2011 | Global Highway Limited | Cyprus | $17,900 |
| | 2/14/2013 | Lucicle Consultants Limited | Cyprus | $14,000 |
| | | | **Vendor R Total** | **$31,900** |
| **Vendor S** | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $5,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Housekeeping in New York) | 10/9/2013 | Global Endeavour Inc. | Grenadines | $10,000 |
| | | | **Vendor S Total** | **$20,000** |

16.   In 2012, MANAFORT caused the following wires to be sent to the entities listed below to purchase the real estate also listed below. MANAFORT did not report the money used to make these purchases on his 2012 tax return.

| Property Purchased | Payee | Date | Originating Account | Country of Origin | Amount |
|---|---|---|---|---|---|
| Howard Street Condominium (New York) | DMP International LLC | 2/1/2012 | Peranova | Cyprus | $1,500,000 |
| Union Street Brownstone, (New York) | Attorney Account Of [Real Estate Attorney] | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,800,000 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,200,000 |
| Arlington House (Virginia) | Real Estate Trust | 8/31/2012 | Lucicle Consultants Limited | Cyprus | $1,900,000 |
| | | | | **Total** | **$6,400,000** |

17.   MANAFORT and GATES also disguised, as purported "loans," more than $10 million transferred from Cypriot entities, including the overseas MANAFORT–GATES entities, to domestic entities owned by MANAFORT. For example, a $1.5 million wire from Peranova to DMI that MANAFORT used to purchase real estate on Howard Street in Manhattan, New York, was recorded as a "loan" from Peranova to DMI, rather than as income. The following loans were shams designed to reduce fraudulently MANAFORT's reported taxable income.

15

| Year | Payor / Ostensible "Lender" | Payee / Ostensible "Borrower" | Country of Origin | Total Amount of "Loans" |
|------|------|------|------|------|
| 2008 | Yiakora Ventures Limited | Jesand Investment Corporation | Cyprus | $8,120,000 |
| 2008 | Yiakora Ventures Limited | DMP | Cyprus | $500,000 |
| 2009 | Yiakora Ventures Limited | DMP | Cyprus | $694,000 |
| 2009 | Yiakora Ventures Limited | Daisy Manafort, LLC | Cyprus | $500,000 |
| 2012 | Peranova | DMI | Cyprus | $1,500,000 |
| 2014 | Telmar Investments Ltd. | DMI | Cyprus | $900,000 |
| 2015 | Telmar Investments Ltd. | DMI | Cyprus | $1,000,000 |
| | | | **Total** | **$13,214,000** |

18.     From 2010 to 2014, GATES caused the following wires, totaling more than $3,000,000, to be sent to entities and bank accounts of which he was a beneficial owner or he otherwise controlled. GATES did not report this income on his tax returns.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|------|------|------|------|------|
| Richard Gates United Kingdom Bank Account A | 3/26/2010 | Serangon Holdings Limited | Cyprus | $85,000 |
| | 4/20/2010 | Serangon Holdings Limited | Cyprus | $50,000 |
| | 5/6/2010 | Serangon Holdings Limited | Cyprus | $150,000 |
| Richard Gates United Kingdom Bank Account B | 9/7/2010 | Serangon Holdings Limited | Cyprus | $160,000 |
| | 10/13/2010 | Serangon Holdings Limited | Cyprus | $15,000 |
| Richard Gates United States Bank Account C | 9/27/2010 | Global Highway Limited | Cyprus | $50,000 |
| | | **2010 Tax Year Total** | | **$510,000** |
| Jemina LLC United States Bank Account D | 9/9/2011 | Peranova | Cyprus | $48,500 |
| Richard Gates United Kingdom Bank Account B | 12/16/2011 | Peranova | Cyprus | $100,435 |
| | | **2011 Tax Year Total** | | **$148,935** |
| Richard Gates United Kingdom Bank Account B | 1/9/2012 | Global Highway Limited | Cyprus | $100,000 |
| | 1/13/2012 | Peranova | Cyprus | $100,435 |
| | 2/29/2012 | Global Highway Limited | Cyprus | $28,500 |
| | 3/27/2012 | Bletilla Ventures Limited | Cyprus | $18,745 |

16

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 4/26/2012 | Bletilla Ventures Limited | Cyprus | $26,455 |
| | 5/30/2012 | Bletilla Ventures Limited | Cyprus | $15,000 |
| | 5/30/2012 | Lucicle Consultants Limited | Cyprus | $14,650 |
| | 6/27/2012 | Bletilla Ventures Limited | Cyprus | $18,745 |
| | 8/2/2012 | Bletilla Ventures Limited | Cyprus | $28,745 |
| | 8/30/2012 | Bletilla Ventures Limited | Cyprus | $38,745 |
| | 9/27/2012 | Bletilla Ventures Limited | Cyprus | $32,345 |
| | 10/31/2012 | Bletilla Ventures Limited | Cyprus | $46,332 |
| | 11/20/2012 | Bletilla Ventures Limited | Cyprus | $48,547 |
| | 11/30/2012 | Bletilla Ventures Limited | Cyprus | $38,532 |
| | 12/21/2012 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | 12/28/2012 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | | | **2012 Tax Year Total** | **$651,448** |
| Richard Gates United Kingdom Bank Account B | 1/11/2013 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | 1/22/2013 | Bletilla Ventures Limited | Cyprus | $34,783 |
| | 1/30/2013 | Bletilla Ventures Limited | Cyprus | $46,583 |
| | 2/22/2013 | Bletilla Ventures Limited | Cyprus | $46,233 |
| | 2/28/2013 | Bletilla Ventures Limited | Cyprus | $46,583 |
| | 3/1/2013 | Bletilla Ventures Limited | Cyprus | $42,433 |
| | 3/15/2013 | Bletilla Ventures Limited | Cyprus | $37,834 |
| | 4/15/2013 | Bletilla Ventures Limited | Cyprus | $59,735 |
| | 4/26/2013 | Bletilla Ventures Limited | Cyprus | $48,802 |
| | 5/17/2013 | Olivenia Trading Limited | Cyprus | $57,798 |
| | 5/30/2013 | Actinet Trading Limited | Cyprus | $45,622 |
| | 6/13/2013 | Lucicle Consultants Limited | Cyprus | $76,343 |
| | 8/7/2013 | Pompolo Limited | United Kingdom | $250,784 |
| | 9/6/2013 | Lucicle Consultants Limited | Cyprus | $68,500 |
| | 9/13/2013 | Cypriot Agent | Cyprus | $179,216 |
| Jemina LLC United States Bank Account D | 7/8/2013 | Marziola Holdings Limited | Cyprus | $72,500 |
| | 9/4/2013 | Marziola Holdings Limited | Cyprus | $89,807 |
| | 10/22/2013 | Cypriot Agent | Cyprus | $119,844 |
| | 11/12/2013 | Cypriot Agent | Cyprus | $80,000 |
| | 12/20/2013 | Cypriot Agent | Cyprus | $90,000 |
| | | | **2013 Tax Year Total** | **$1,541,237** |
| Jemina LLC United States Bank Account D | 2/10/2014 | Cypriot Agent | Cyprus | $60,044 |
| | 4/29/2014 | Cypriot Agent | Cyprus | $44,068 |
| | 10/6/2014 | Global Endeavour Inc. | Grenadines | $65,000 |

17

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| Bade LLC United States Bank Account E | 11/25/2014 | Global Endeavour Inc. | Grenadines | $120,000 |
| | | | 2014 Tax Year Total | $289,112 |

## MANAFORT And GATES' Hiding Foreign Bank Accounts And False Filings

19.    United States citizens who have authority over certain foreign bank accounts—whether or not the accounts are set up in the names of nominees who act for their principals—have reporting obligations to the United States.

20.    First, the Bank Secrecy Act and its implementing regulations require United States citizens to report to the Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeds $10,000 at any point during the year. This is commonly known as a foreign bank account report or "FBAR." The Bank Secrecy Act requires these reports because they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings. The Treasury's Financial Crimes Enforcement Network (FinCEN) is the custodian for FBAR filings, and FinCEN provides access to its FBAR database to law enforcement entities, including the Federal Bureau of Investigation. The reports filed by individuals and businesses are used by law enforcement to identify, detect, and deter money laundering that furthers criminal enterprise activity, tax evasion, and other unlawful activities.

21.    Second, United States citizens also are obligated to report information to the IRS regarding foreign bank accounts. For instance, in 2010, Schedule B of IRS Form 1040 had a "Yes" or "No" box to record an answer to the question: "At any time during [the calendar year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a

18

bank account, securities account, or other financial account?" If the answer was "Yes," then the form required the taxpayer to enter the name of the foreign country in which the financial account was located.

22.     For each year in or about and between 2008 through at least 2014, MANAFORT had authority over foreign accounts that required an FBAR filing. Specifically, MANAFORT was required to report to the Treasury each foreign bank account held by the foreign MANAFORT–GATES entities noted above in paragraph 12 that bears the initials PM. No FBAR filings were made by MANAFORT for these accounts.

23.     For each year in or about and between 2010 through at least 2013, GATES had authority over foreign accounts that required an FBAR filing. Specifically, GATES was required to report to the United States Treasury each foreign bank account held by the foreign MANAFORT–GATES entities noted above in paragraph 12 that bears the initials RG, as well as United Kingdom Bank Accounts A and B noted in paragraph 18. No FBAR filings were made by GATES for these accounts.

24.     Furthermore, in each of MANAFORT's tax filings for 2008 through 2014, MANAFORT, with the assistance of GATES, represented falsely that he did not have authority over any foreign bank accounts. MANAFORT and GATES had repeatedly and falsely represented in writing to MANAFORT's tax preparer that MANAFORT had no authority over foreign bank accounts, knowing that such false representations would result in false tax filings in MANAFORT's name. For instance, on October 4, 2011, MANAFORT's tax preparer asked MANAFORT in writing: "At any time during 2010, did you [or your wife or children] have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?"    On the same day, MANAFORT falsely responded "NO."

19

MANAFORT responded the same way as recently as October 3, 2016, when MANAFORT's tax preparer again emailed the question in connection with the preparation of MANAFORT's tax returns: "Foreign bank accounts etc.?"  MANAFORT responded on or about the same day: "NONE."

25.     In each of GATES' tax filings for 2010 through 2013, GATES represented falsely that he did not have authority over any foreign bank accounts.  GATES had repeatedly and falsely represented to his tax preparers that he had no authority over foreign bank accounts, knowing that such false representations would result in false tax filings.  As recently as October 2017, in preparation for his amended 2013 tax filing, GATES was asked by his tax preparer: "Did you have any foreign assets/bank accounts during 2013 or 2014?" to which he responded "no."

## The Financial Institution Scheme

26.     Between in or around 2015 and the present, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, MANAFORT, GATES, and others devised and intended to devise, and executed and attempted to execute, a scheme and artifice to defraud, and to obtain money and property, by means of false and fraudulent pretenses, representations, and promises, from banks and other financial institutions.  As part of the scheme, MANAFORT and GATES repeatedly provided and caused to be provided false information to banks and other lenders, among others.

## MANAFORT And GATES' Fraud To Access Offshore Money

27.     When they were flush with Ukraine funds, MANAFORT, with the assistance of GATES, used their offshore accounts to purchase and improve real estate in the United States.  When the income from Ukraine dwindled in 2014 and 2015, MANAFORT, with the assistance of GATES, obtained millions of dollars in mortgages on the United States properties, thereby allowing

MANAFORT to have the benefits of liquid income without paying taxes on it. MANAFORT and GATES defrauded the lenders in various ways, including by lying about MANAFORT's and DMI's income, lying about their debt, and lying about MANAFORT's use of the property and the loan proceeds. For example, MANAFORT and GATES submitted fabricated profit and loss statements (P&Ls) that inflated income, and they caused others to provide doctored financial documents.

A. The Loan From Lender A On The Union Street Property

28.     In 2012, MANAFORT, through a corporate vehicle called "MC Brooklyn Holdings, LLC" owned by him and his family, bought a brownstone on Union Street in the Carroll Gardens section of Brooklyn, New York. He paid approximately $3,000,000 in cash for the property. All of that money came from a MANAFORT–GATES entity in Cyprus. After purchase of the property, MANAFORT began renovations to transform it from a multi-family dwelling into a single-family home. MANAFORT used proceeds of a 2015 loan obtained from a financial institution to make the renovations. In order to obtain that loan, MANAFORT falsely represented to the bank that he did not derive more than 50% of his income/wealth from a country outside the United States.

29.     In late 2015 through early 2016, MANAFORT sought to borrow cash against the Union Street property from Lender A. Lender A provided greater loan amounts for "construction loans"—that is, loans that required the loan funds to be used to pay solely for construction on the property and thus increase the value of the property serving as the loan's collateral. The institution would thus loan money against the expected completed value of the property, which in the case of the Union Street property was estimated to be $8,000,000. In early 2016, MANAFORT was able to obtain a loan of approximately $5,000,000, after promising Lender A that approximately $1,400,000 of the loan would be used solely for construction on the Union Street property.

21

MANAFORT never intended to limit use of the proceeds to construction as required by the loan contracts and never did. In December 2015, before the loan was made, MANAFORT wrote his tax preparer, among others, that the "construction mortgage will allow me to pay back [another Manafort apartment] mortgage in full. . . ." Further, when the construction loan closed, MANAFORT used hundreds of thousands of dollars for purposes unrelated to the construction of the property.

### B. The Loan From Lender B On The Howard Street Property

30.     In 2012, MANAFORT, through a corporate vehicle called "MC Soho Holdings, LLC" owned by him and his family, bought a condominium on Howard Street in the Soho neighborhood of Manhattan, New York. He paid approximately $2,850,000. All the money used to purchase the condominium came from MANAFORT–GATES entities in Cyprus. MANAFORT used the property from at least January 2015 through at least August 2017 as an income-generating rental property, charging thousands of dollars a week on Airbnb, among other places. On his tax returns, MANAFORT took advantage of the beneficial tax consequences of owning this rental property.

31.     In late 2015 through early 2016, MANAFORT applied for a mortgage on the Howard Street condominium from Lender B for approximately $3.4 million. Because the bank would permit a greater loan amount if the property were owner-occupied, MANAFORT falsely represented to the lender and its agents that it was a secondary home used as such by his daughter and son-in-law and was not held as a rental property. In an email on January 6, 2016, MANAFORT noted: "[i]n order to have the maximum benefit, I am claiming Howard St. as a second home. Not an investment property." Later, on January 26, 2016, MANAFORT wrote to his son-in-law to advise him that when the bank appraiser came to assess the condominium, his son-in-law should "[r]emember, he believes that you and [MANAFORT's daughter] are living there."

32.    MANAFORT, with GATES' assistance, also made a series of false and fraudulent representations to the bank in order to secure the millions of dollars in financing.  For example, MANAFORT falsely represented the amount of debt he had by failing to disclose on his loan application the existence of the Lender A mortgage on his Union Street property.  That liability would have risked his qualifying for the loan.  Through its own due diligence, Lender B found evidence of the existing mortgage on the Union Street property.  As a result, Lender B wrote to MANAFORT and GATES that the "application has the following properties as being owned free & clear . . . Union Street," but "[b]ased on the insurance binders that we received last night, we are showing that there are mortgages listed on these properties, can you please clarify[?]"

33.    To cover up the falsity of the loan application, GATES, on MANAFORT's behalf, caused an insurance broker to provide Lender B false information, namely, an outdated insurance report that did not list the Union Street loan.  MANAFORT and GATES knew such a representation was fraudulent.  After GATES contacted the insurance broker and asked her to provide Lender B with false information, he updated MANAFORT by email on February 24, 2016.  MANAFORT replied to GATES, on the same day: "good job on the insurance issues."

34.    MANAFORT and GATES submitted additional false and fraudulent statements to Lender B.  For example, MANAFORT submitted 2014 DMI tax returns to support his 2016 loan application to Lender B.  Those tax returns included as a purported liability a $1.5 million loan from Peranova.  Peranova was a Cypriot entity controlled by MANAFORT and GATES.  On or about February 1, 2012, Peranova transferred $1.5 million to a DMI account in the United States, denominating the transfer as a loan so that MANAFORT would not have to declare the money as income.  MANAFORT used the "loan" to acquire the Howard Street property.

35.    When MANAFORT needed to obtain a loan from Lender B, the existence of the Peranova

23

"loan" undermined his creditworthiness. As a result of the listed Peranova liability, Lender B was not willing to make the loan to MANAFORT. To circumvent this issue, MANAFORT and GATES caused MANAFORT's tax accountant to send to Lender B back-dated documentation that falsely stated that the $1.5 million Peranova loan had been forgiven in 2015, and falsely inflated income for 2015 to mask MANAFORT's 2015 drop in income.

36.   In March 2016, Lender B approved the loan in the amount of approximately $3.4 million (the $3.4 million loan).

C.   The Loan From Lender C

37.   In approximately February 2016, MANAFORT applied for a business loan from Lender C. MANAFORT made a series of false statements to Lender C. For example, MANAFORT submitted a false statement of assets and liabilities that failed to disclosed the Lender A loan on the Union Street property and misrepresented, among other things, the amount of the mortgage on the Howard Street property.

38.   Further, in approximately March 2016, MANAFORT and GATES submitted a doctored 2015 DMI P&L that overstated DMI's 2015 income by more than $4 million. GATES asked DMI's bookkeeper to send him a "Word Document version of the 2015 P&L for [DMI]" because MANAFORT wanted GATES "to add the accrual revenue which we have not received in order to send to [Lender C]." The bookkeeper said she could send a .pdf version of the P&L. GATES then asked the bookkeeper to increase the DMI revenue, falsely claiming that: "[w]e have $2.4m in accrued revenue that [MANAFORT] wants added to the [DMI] 2015 income. Can you make adjustments on your end and then just send me a new scanned version[?]" The bookkeeper refused since the accounting method DMI used did not permit recording income before it was actually received.

24

39.    Having failed to secure a falsified P&L from the bookkeeper, GATES falsified the P&L. GATES wrote to MANAFORT and another conspirator, "I am editing Paul's 2015 P&L statement." GATES then sent the altered P&L to Lender C, which claimed approximately $4.45 million in net income, whereas the true P&L had less than $400,000 in net income.

### D.    The Loan From Lender B On The Union Street Property

40.    In March 2016, MANAFORT, with the assistance of GATES and others, applied for a $5.5 million loan from Lender B on the Union Street property.  As part of the loan process, MANAFORT submitted a false statement of assets and liabilities that hid his prior loan from Lender A on the Union Street property, among other liabilities.  In addition, another conspirator on MANAFORT's behalf submitted a falsified 2016 DMI P&L. The falsified 2016 DMI P&L overstated DMI's income by more than $2 million, which was the amount that Lender B told MANAFORT he needed to qualify for the loan.  When the document was first submitted to Lender B, a conspirator working at Lender B replied: "Looks Dr'd. Can't someone just do a clean excel doc and pdf to me??" A subsequent version was submitted to the bank.

### E.    The Loans From Lender D On The Bridgehampton And Union Street Properties

41.    In 2016, MANAFORT sought a mortgage on property in Bridgehampton, New York from a financial institution. In connection with his application, MANAFORT falsely represented to the bank that DMI would be receiving $2.4 million in income later in the year for work on a "democratic development consulting project."   To support this representation, GATES, on MANAFORT's behalf, provided the bank with a fake invoice for $2.4 million, directed "To Whom It May Concern," for "[s]ervices rendered per the consultancy agreement pertaining to the parliamentary elections."   The bank, unwilling to rely on the invoice to support MANAFORT's stated 2016 income, requested additional information. The bank was unable to obtain satisfactory

support for the stated income, and the loan application was denied.

42.    MANAFORT applied to a second bank, Lender D. Between approximately July 2016 and January 2017, MANAFORT, with the assistance of GATES, sought and secured approximately $16,000,000 in two loans from Lender D. MANAFORT used the Bridgehampton property as collateral for one loan, and the Union Street property for the other.

43.    MANAFORT and GATES made numerous false and fraudulent representations to secure the loans. For example, MANAFORT provided the bank with doctored P&Ls for DMI for both 2015 and 2016, overstating its income by millions of dollars. The doctored 2015 DMI P&L submitted to Lender D was the same false statement previously submitted to Lender C, which overstated DMI's income by more than $4 million. The doctored 2016 DMI P&L was inflated by MANAFORT by more than $3.5 million. To create the false 2016 P&L, on or about October 21, 2016, MANAFORT emailed GATES a .pdf version of the real 2016 DMI P&L, which showed a loss of more than $600,000. GATES converted that .pdf into a "Word" document so that it could be edited, which GATES sent back to MANAFORT. MANAFORT altered that "Word" document by adding more than $3.5 million in income. He then sent this falsified P&L to GATES and asked that the "Word" document be converted back to a .pdf, which GATES did and returned to MANAFORT. MANAFORT then sent the falsified 2016 DMI P&L .pdf to Lender D.

44.    In addition, Lender D questioned MANAFORT about a $300,000 delinquency on his American Express card, which was more than 90 days past due. The delinquency significantly affected MANAFORT's credit rating score. MANAFORT falsely represented to Lender D that he had lent his credit card to a friend, GATES, who had incurred the charges and had not reimbursed him. MANAFORT supplied Lender D a letter from GATES that falsely stated that

26

GATES had borrowed MANAFORT's credit card to make the purchases at issue and would pay him back by a date certain.

### Statutory Allegations

#### COUNTS ONE THROUGH FIVE
(Subscribing to False United States Individual Income
Tax Returns For 2010–2014 Tax Years)

45.     Paragraphs 1 through 44 are incorporated here.

46.     On or about the dates specified below, in the Eastern District of Virginia and elsewhere, defendant PAUL J. MANAFORT, JR., willfully and knowingly did make and subscribe, and aid and abet and cause to be made and subscribed, United States Individual Income Tax Returns, Forms 1040 and Schedule B, for the tax years set forth below, which returns contained and were verified by the written declaration of MANAFORT that they were made under penalties of perjury, and which returns MANAFORT did not believe to be true and correct as to every material matter, in that the returns (a) claimed that MANAFORT did not have a financial interest in and signature and other authority over a financial account in a foreign country and (b) failed to report income, whereas MANAFORT then and there well knew and believed that he had a financial interest in, and signature and other authority over, bank accounts in a foreign country and had earned total income in excess of the reported amounts noted below:

| COUNT | TAX YEAR | APPROX. FILING DATE | FOREIGN ACCOUNT REPORTED (Sch. B, Line 7a) | TOTAL INCOME REPORTED (Line 22) |
|---|---|---|---|---|
| 1 | 2010 | October 14, 2011 | None | $504,744 |
| 2 | 2011 | October 15, 2012 | None | $3,071,409 |
| 3 | 2012 | October 7, 2013 | None | $5,361,007 |
| 4 | 2013 | October 6, 2014 | None | $1,910,928 |
| 5 | 2014 | October 14, 2015 | None | $2,984,210 |

(26 U.S.C. § 7206(l); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNTS SIX THROUGH TEN
(Assisting in the Preparation of
False United States Individual Income
Tax Returns For 2010–2014 Tax Years)

47.   Paragraphs 1 through 44 are incorporated here.

48.   On or about the dates specified below, in the Eastern District of Virginia and elsewhere,

defendant RICHARD W. GATES III willfully and knowingly did aid and assist in, and procure,

counsel, and advise the preparation and presentation to the Internal Revenue Service, of a United

States Individual Income Tax Return, Form 1040 and Schedule B, of PAUL J. MANAFORT, JR.,

for the tax years set forth below, which returns were false and fraudulent as to a material matter,

in that the returns (a) claimed that MANAFORT did not have a financial interest in, and signature

and other authority over, a financial account in a foreign country and (b) failed to report income,

whereas GATES then and there well knew and believed that MANAFORT had a financial interest

in, and signature and other authority over, bank accounts in a foreign country and had earned total

income in excess of the reported amounts noted below:

| COUNT | TAX YEAR | APPROX. FILING DATE | FOREIGN ACCOUNT REPORTED (Sch. B, Line 7a) | TOTAL INCOME REPORTED (Line 22) |
|---|---|---|---|---|
| 6 | 2010 | October 14, 2011 | None | $504,744 |
| 7 | 2011 | October 15, 2012 | None | $3,071,409 |
| 8 | 2012 | October 7, 2013 | None | $5,361,007 |
| 9 | 2013 | October 6, 2014 | None | $1,910,928 |
| 10 | 2014 | October 14, 2015 | None | $2,984,210 |

(26 U.S.C. § 7206(2); 18 U.S.C. § 3551 et seq.)

## COUNTS ELEVEN THROUGH FOURTEEN
(Failure To File Reports Of Foreign Bank And Financial
Accounts For Calendar Years 2011–2014)

49.   Paragraphs 1 through 44 are incorporated here.

50.   On the filing due dates listed below, in the Eastern District of Virginia and elsewhere,

defendant PAUL J. MANAFORT, JR., unlawfully, willfully, and knowingly did fail to file with the Treasury an FBAR disclosing that he had a financial interest in, and signature and other authority over, a bank, securities, and other financial account in a foreign country, which had an aggregate value of more than $10,000 in a 12-month period, during the years listed below:

| COUNT | YEAR | DUE DATE TO FILE FBAR |
|-------|------|-----------------------|
| 11 | 2011 | June 29, 2012 |
| 12 | 2012 | June 30, 2013 |
| 13 | 2013 | June 30, 2014 |
| 14 | 2014 | June 30, 2015 |

(31 U.S.C. §§ 5314 and 5322(a); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNTS FIFTEEN THROUGH NINETEEN
(Subscribing to False United States Individual Income
Tax Returns For 2010–2014 Tax Years)

51.    Paragraphs 1 through 44 are incorporated here.

52.    On or about the dates specified below, in the Eastern District of Virginia and elsewhere, defendant RICHARD W. GATES III willfully and knowingly did make and subscribe, and aid and abet and cause to be made and subscribed, United States Individual Income Tax Returns, Forms 1040 and Schedule B, for the tax years set forth below, which returns contained and were verified by the written declaration of defendant GATES that they were made under penalties of perjury, and which returns defendant GATES did not believe to be true and correct as to every material matter, in that the returns (a) claimed that GATES did not have a financial interest in, and signature and other authority over, a financial account in a foreign country and (b) failed to report income, whereas GATES then and there well knew and believed that he had a financial interest in, and signature and other authority over, a financial account in a foreign country and had earned total income in excess of the reported amounts noted below:

| COUNT | TAX YEAR | APPROX. FILING DATE | FOREIGN ACCOUNT REPORTED (Sch. B, Line 7a) | TOTAL INCOME REPORTED (Line 22) |
|-------|----------|---------------------|---------------------------------------------|----------------------------------|
| 15 | 2010 | July 26, 2011 | None | $194,257 |
| 16 | 2011 | October 11, 2012 | None | $250,307 |
| 17 | 2012 | October 15, 2013 | None | $365,646 |
| 18 | 2013 | October 15, 2014 | None | $307,363 |
| 19 | 2014 | October 14, 2015 | None | $292,892 |

(26 U.S.C. § 7206(l); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNT TWENTY
(Subscribing to a False Amended United States Individual Income
Tax Return For 2013 Tax Year)

53.    Paragraphs 1 through 44 are incorporated here.

54.    On or about October 25, 2017, in the Eastern District of Virginia and elsewhere, defendant

RICHARD W. GATES III willfully and knowingly did make and subscribe, and aid and abet and

cause another to make and subscribe, a United States Individual Income Tax Return, Form 1040X,

for the 2013 tax year, which return contained and was verified by the written declaration of

defendant GATES that it was made under penalties of perjury, and which return defendant GATES

did not believe to be true and correct as to every material matter, in that the return failed to report

income, whereas GATES then and there well knew and believed that he had earned adjusted gross

income in excess of the reported amount on Line 1C, to wit: $292,055.

(26 U.S.C. § 7206(l); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNTS TWENTY-ONE THROUGH TWENTY-THREE
(Failure To File Reports Of Foreign Bank And Financial
Accounts For Calendar Years 2011–2013)

55.    Paragraphs 1 through 44 are incorporated here.

56.    On the filing due dates listed below, in the Eastern District of Virginia and elsewhere,

defendant RICHARD W. GATES III unlawfully, willfully, and knowingly did fail to file with the

Treasury an FBAR disclosing that he had a financial interest in, and signature authority over, a bank, securities, and other financial account in a foreign country, which had an aggregate value of more than $10,000 in a 12-month period, during the years listed below:

| COUNT | YEAR | DUE DATE TO FILE FBAR |
|-------|------|----------------------|
| 21 | 2011 | June 29, 2012 |
| 22 | 2012 | June 30, 2013 |
| 23 | 2013 | June 30, 2014 |

(31 U.S.C. §§ 5314 and 5322(a); 18 U.S.C. §§ 2 and 3551 et seq.)

### COUNT TWENTY-FOUR
(Bank Fraud Conspiracy / Lender B / $3.4 million loan)

57.    Paragraphs 1 through 44 are incorporated here.

58.    On or about and between December 2015 and March 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender B, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

### COUNT TWENTY-FIVE
(Bank Fraud / Lender B / $3.4 million loan)

59.    Paragraphs 1 through 44 are incorporated here.

60.    On or about and between December 2015 and March 2016, both dates being approximate

31

and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender B, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises.

(18 U.S.C. §§ 1344, 2, and 3551 et seq.)

## COUNT TWENTY-SIX
(Bank Fraud Conspiracy / Lender C / $1 million loan)

61.   Paragraphs 1 through 44 are incorporated here.

62.   On or about and between March 2016 and May 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender C, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

## COUNT TWENTY-SEVEN
(Bank Fraud / Lender C / $1 million loan)

63.   Paragraphs 1 through 44 are incorporated here.

64.   On or about and between December 2015 and March 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J.

MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender C, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises.

(18 U.S.C. §§ 1344, 2, and 3551 et seq.)

COUNT TWENTY-EIGHT<br>(Bank Fraud Conspiracy / Lender B / $5.5 million loan)

65.    Paragraphs 1 through 44 are incorporated here.

66.    On or about and between March 2016 and August 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender B, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

COUNT TWENTY-NINE<br>(Bank Fraud Conspiracy / Lender D / $9.5 million loan)

67.    Paragraphs 1 through 44 are incorporated here.

68.    On or about and between April 2016 and November 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to

33

execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender D, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

## COUNT THIRTY
(Bank Fraud / Lender D / $9.5 million loan)

69.    Paragraphs 1 through 44 are incorporated here.

70.    On or about and between April 2016 and November 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender D, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises.

(18 U.S.C. § 1344, 2, and 3551 et seq.)

## COUNT THIRTY-ONE
(Bank Fraud Conspiracy / Lender D / $6.5 million loan)

71.    Paragraphs 1 through 44 are incorporated here.

72.    On or about and between April 2016 and January 2017, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender D, the deposits of which

34

were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

## COUNT THIRTY-TWO
(Bank Fraud / Lender D / $6.5 million loan)

73. Paragraphs 1 through 44 are incorporated here.

74. On or about and between April 2016 and January 2017, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender D, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises.

(18 U.S.C. §§ 1344, 2, and 3551 et seq.)

## FORFEITURE NOTICE

75. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(2), in the event of the defendants' convictions under Counts Twenty-Four through Thirty-Two of this Superseding Indictment. Upon conviction of the offenses charged in Counts Twenty-Four through Thirty-Two, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III shall forfeit to the United States any property constituting, or derived from, proceeds

35

obtained, directly or indirectly, as a result of such violation(s). Notice is further given that, upon conviction, the United States intends to seek a judgment against each defendant for a sum of money representing the property described in this paragraph, as applicable to each defendant (to be offset by the forfeiture of any specific property).

76.    The grand jury finds probable cause to believe that the property subject to forfeiture by PAUL J. MANAFORT, JR., includes, but is not limited to, the following listed assets:

    a.  All funds held in account number XXXXXX0969 at Lender D, and any property traceable thereto.

## Substitute Assets

77.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of any defendant

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853, to seek forfeiture of any other property of said defendant.

(18 U.S.C. § 982)

36

Robert S. Mueller, III
Special Counsel
Department of Justice

A TRUE BILL:
Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
Foreperson

Date:  February 22, 2018

37