**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

UNITED STATES OF AMERICA

v.

PAUL J. MANAFORT, JR.,

                *Defendant.*

Criminal Action No. 1:18-cr-83

**Oral Argument Requested**

**MEMORANDUM IN SUPPORT OF THE MOTION OF THE REPORTERS**
**COMMITTEE FOR FREEDOM OF THE PRESS AND THE WASHINGTON POST**
**TO INTERVENE AND UNSEAL A JUDICIAL RECORD**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 4

I. The Appointment of Special Counsel Mueller and the Rosenstein Memo ............. 4

II. The Special Counsel's Investigation and the Grand Jury Proceeding ................... 7

III. Public Access to the Special Counsel's Report and the Rosenstein Memo .......... 10

IV. Reporting on the Egypt Investigation ................................................... 10

ARGUMENT ........................................................................................................................ 14

I. The Court Should Grant the Media Intervenors' Motion to Intervene. ................ 14

II. The First Amendment and Common Law Rights of Access Require
Unsealing of the Rosenstein Memo. .................................................... 16

CONCLUSION ..................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*In re Associated Press,*
162 F.3d 503 (7th Cir. 1998) .................................................................15

*BP Expl. & Prod., Inc. v. Claimant ID 100246928,*
920 F.3d 209 (5th Cir. 2019) .................................................................15

*In re Charlotte Observer,*
921 F.2d 47 (4th Cir. 1990) ...................................................................19

*Doe v. Pub. Citizen,*
749 F.3d 246 (4th Cir. 2014) ...........................................14, 17, 18, 22

*E.E.O.C. v. Nat'l Children's Ctr., Inc.,*
146 F.3d 1042 (D.C. Cir. 1998) .............................................................15

*Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.,*
830 F.2d 404 (1st Cir. 1987) ..................................................................22

*Ford v. City of Huntsville,*
242 F.3d 235 (5th Cir. 2001) .................................................................15

*In re Grand Jury Investigation,*
916 F.3d 1047 (D.C. Cir. 2019) ...............................................................5

*In re Grand Jury Subpoena,*
139 S. Ct. 1378 (2019) .........................................................................7, 8

*In re Grand Jury Subpoena,*
749 F. App'x 1 (D.C. Cir. 2018) ..........................................................7, 8

*Hill Phoenix, Inc. v. Systematic Refrigeration, Inc.,*
117 F. Supp. 2d 508 (E.D. Va. 2000) ....................................................15

*Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.,*
2021 WL 168458 (D. Md. Jan. 19, 2021) ..............................................14

*Lugosch v. Pyramid Co. of Onondaga,*
435 F.3d 110 (2d. Cir. 2006) .................................................................18

*Oregonian Pub. Co. v. United States Dist. Court,*
920 F.2d 1462 (9th Cir. 1990) ...............................................................23

*Press-Enter. Co. v. Superior Ct. of California,*
464 U.S. 501 (1984) ...............................................................................16

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980) .................................................................................4

*Rosenfeld v. Montgomery Cnty. Pub. Sch.*,
  25 F. App'x 123 (4th Cir. 2001) ........................................................................15

*Rushford v. New Yorker Mag., Inc.*,
  846 F.2d 249 (4th Cir. 1988) ......................................................................14, 18

*Stone v. Univ. of Md. Med. Sys. Corp.*,
  855 F.2d 178 (4th Cir. 1988) ............................................................................17

*In re Time Inc.*,
  182 F.3d 270 (4th Cir. 1999) ......................................................................17, 18

*In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*,
  707 F.3d 283 (4th Cir. 2013) ......................................................................17, 18

*United States v. Bas*,
  2022 WL 1270841 (D. Md. Apr. 28, 2022) ......................................................14

*United States v. Doe*,
  962 F.3d 139 (4th Cir. 2020) ............................................................................17

*United States v. Hubbard*,
  650 F.2d 293 (D.C. Cir. 1980) ..........................................................................18

*United States v. Manafort*,
  321 F. Supp. 3d 640 (E.D. Va. 2018) ....................................................17, 18, 19

*United States v. Matthews*,
  2008 WL 5210706 (E.D. Va. Dec. 12, 2008) ....................................................14

*United States v. Petraeus*,
  2015 WL 3606028 (W.D.N.C. June 8, 2015) ....................................................14

*Va. Dep't of State Police v. Wash. Post*,
  386 F.3d 567 (4th Cir. 2004) ......................................................................18, 19

*In re Washington Post Co.*,
  807 F.2d 383 (4th Cir. 1986) ................................................................16, 18, 21

*Washington Post v. Robinson*,
  935 F.2d 282 (D.C. Cir. 1991) ......................................................................22, 23

**Other Authorities**

Independent and Special Counsel Investigations, GovInfo,
  https://www.govinfo.gov/collection/independent-counsel-investigations.....................................21

Special Counsel Robert S. Mueller III, U.S. Dep't of Justice, Report on the
  Investigation into Russian Interference in the 2016 Presidential Election (Mar.
  2019), available at https://www.documentcloud.org/documents/20401632-
  updated-mueller-report-leopold-foia-11220 ................................................7, 10, 22

iii

**Rules & Regulations**

28 C.F.R. § 600.8(c)..............................................................................................................21

Federal Rule of Civil Procedure 24 ...............................................................................15

The Reporters Committee for Freedom of the Press (the "Reporters Committee") and WP Company, LLC d/b/a The Washington Post (the "Post") (together "Media Intervenors"), by and through their undersigned counsel, hereby submit this Memorandum in support of their motion to intervene in the above-captioned action for the limited purpose of seeking an order unsealing the August 2, 2017, memorandum authored by then-Deputy Attorney General Rod Rosenstein (hereinafter, the "Rosenstein Memo" or "Memo") that was filed under seal on May 17, 2018. *See United States v. Manafort*, No. 18-cr-00083 (E.D. Va.), ECF Nos. 52, 71.

## PRELIMINARY STATEMENT

For purposes of deciding Defendant Paul Manafort's motion to dismiss the Superseding Indictment in this criminal case in 2018, the Court ordered the United States (the "Government") to file an unredacted copy of the Rosenstein Memo—a document that previously had been filed only in redacted form—under seal. The Memo sets forth the scope of the investigation that Special Counsel Robert S. Mueller III had, at the time, been authorized to undertake. Now, more than seven years after Deputy Attorney General Rosenstein wrote the Memo, more than six years after this Court reviewed it *ex parte*, and more than five years after Special Counsel Mueller's investigation ended, only a few lines of the Memo's text remain hidden from public view.

Continued redaction of those lines can no longer be justified. Considering all the public now knows about the Special Counsel's investigation alongside the least-redacted version of the Memo that is now public, it appears only one area of inquiry set forth in the Memo remains hidden: the investigation into possible financial support provided by a foreign power—Egypt—to the first presidential campaign of Donald J. Trump. The Egypt investigation, which was later transferred from the Special Counsel's Office to the United States Attorney's Office for the District of Columbia ("USAO-DC") was formally closed in June 2020, and detailed information about that

1

investigation is now public.  Accordingly, the entirety of the Rosenstein Memo should now be unsealed.

The press and public have a qualified First Amendment and common law right of access to judicial documents filed in criminal cases.  Those rights attach to the Rosenstein Memo, the entirety of which was considered by the Court for purposes of deciding Mr. Manafort's motion to dismiss.  As a result, continued sealing of the Memo can be justified only if—and even then, only to the extent—that sealing is necessitated by a compelling, countervailing interest.

No such countervailing—let alone compelling—interests remain.  Mr. Manafort has been convicted, sentenced, and pardoned.  Thus, even assuming he had some interest in keeping the still-redacted portion of the Rosenstein Memo under wraps at some point in time, his criminal case is long over and any such interest long evaporated.  The Government has no interest in continued secrecy either.  The Special Counsel's investigation ended years go, and the report he submitted in 2019 is public with limited redactions.  And although the Government previously may have had a valid interest in keeping the existence of the Egypt investigation secret, even after the Special Counsel handed off the probe to the USAO-DC, that investigation is long over, and the cat is now out of the bag.

On August 2, the Post published an expansive story that provides extraordinary insight into the Egypt investigation—including on-the-record statements from relevant actors (a former prosecutor overseeing the Egypt investigation, a spokesperson from Egypt's Foreign Press Center, and a spokesperson for candidate Trump) confirming its existence and its closure.  As the Post's story details, the investigation was looking into reports "that Egyptian President Abdel Fatah El-Sisi sought to give Trump $10 million to boost his 2016 presidential campaign," and whether "money from Sisi might have factored into Trump's decision in the final days of his run for the

2

White House to inject his campaign with $10 million of his own money." Ex. 1 (Aaron C. Davis & Carol D. Leonnig, *$10M Cash Withdrawal Drove Secret Probe into Whether Trump Took Money from Egypt*, Wash. Post (Aug. 2, 2024), https://www.washingtonpost.com/investigations/2024/08/02/trump-campaign-egypt-investigation/ ("Davis & Leonnig")) at 1; *see also* Ex. 2 (Carol D. Leonnig & Aaron C. Davis, *House Democrats Ask Trump If He Illegally Accepted $10 Million From Egypt*, Wash. Post (Sept. 3, 2024), https://www.washingtonpost.com/investigations/2024/09/03/trump-egypt-investigation-menendez/ ("Leonnig & Davis")).[1]  The information now public about the Egypt investigation, reported by the Post and other news outlets, undercuts any purported need for continued secrecy.[2]

By contrast, the public's interest in access to the still-redacted lines in the Memo is immense. More than five years after the Mueller investigation ended, the public still does not have access to the entirety of the Memo setting forth the full sweep of the investigation the Special Counsel was authorized to undertake—an investigation that touched not only allegations as to Mr. Manafort, but also the Egypt investigation. *See* Ex. 4 (May 6, 2020 Letter from Stephen E. Boyd, Assistant Attorney General, to Hon. Lindsey Graham, Chairman, U.S. Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/SJC%20Scope%20Memo%20-%202020-05-06.pdf ("Boyd Letter")) (attaching redacted Rosenstein Memo).

---

[1] Citations to "Ex. __" refer to exhibits to the accompanying Declaration of Katherine Maddox Davis in Support of the Motion of the Reporters Committee for Freedom of the Press and the Washington Post to Intervene and Unseal a Judicial Record.

[2] Several details in the Post's August 2024 reporting on the Egypt investigation were also reported by *The New York Times*, in an article published after the Post's. *See* Ex. 3 (Michael S. Schmidt, Adam Goldman & Glenn Thrush, *Alongside the Trump-Russia Inquiry, a Lesser-Known Look at Egyptian Influence*, N.Y. Times (Aug. 2, 2024), https://www.nytimes.com/2024/08/02/us/politics/trump-mueller-egypt.html ("Schmidt, Goldman & Thrush")).

And as to the Egypt investigation, specifically, the Post's reporting raises weighty questions about how it was undertaken, the direction of the investigation, why it was closed under the Trump administration, and why it was not reopened under the Biden administration. *See* Ex. 1 (Davis & Leonnig) at 10 (describing "[f]rustrated investigators" who argued to the prosecutor then overseeing the Egypt investigation that "in any other case – even with far less compelling evidence – they would have been able to obtain additional bank records"); *id.* at 12 (noting that, "[i]n an interview with The Post," the Justice Department official who closed the investigation "said Biden administration appointees . . . could have relaunched the probe if they disagreed" with his decision). These questions cut to the central purposes of the public's First Amendment and common law access rights: ensuring government accountability to the public and public confidence in our institutions. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980); *see also id.* at 592 (Brennan, J., concurring) (explaining that "public access . . . is one of the numerous checks and balances of our system" (quotation marks omitted)). Unsealing of the remaining, still-redacted portions of the Memo would serve these important public interests.

The Reporters Committee and the Post therefore respectfully request that the Court grant their motion to intervene and enter an order unsealing the Memo in its entirety or, at the very least, unsealing any portions that pertain to the now-public Egypt investigation.

## STATEMENT OF FACTS

### I.  The Appointment of Special Counsel Mueller and the Rosenstein Memo

In the wake of the 2016 presidential election, media reports drew attention to apparently unprecedented efforts by foreign governments to influence the outcome of the election. *See, e.g.,* Ex. 5 (*What We Know – and Don't Know – About the Trump Team's Contacts with Russia Before*

4

*the Election*, ABC News (Feb. 15, 2017), https://abcnews.go.com/Politics/trump-teams-contacts-russia-election/story?id=45508470).   Then, in May 2017, Deputy Attorney General Rod Rosenstein appointed Robert S. Mueller III to serve as Special Counsel for the Department of Justice.   *See In re Grand Jury Investigation*, 916 F.3d 1047, 1051 (D.C. Cir. 2019).   Deputy Attorney General Rosenstein authorized the Special Counsel to investigate foreign governmental efforts, ostensibly by Russia, to interfere in the 2016 presidential election and related matters, and to prosecute any federal crimes uncovered during the investigation.   *Id.*

The Special Counsel's appointment was effectuated by a "one-page appointment order" that, "[c]onsistent with longstanding Department of Justice policy," did not identify any specific topics or individual targets of the investigation. Ex. 6 (Kathryn Watson, *DOJ Won't Give Congress Memo About Scope of Russia Probe*, CBS News (May 2, 2018), https://www.cbsnews.com/news/doj-wont-give-congress-memo-about-russia-probes-scope/ ("Watson")) at 2 (quoting an April 30, 2018 letter from Assistant Attorney General Stephen Boyd to members of Congress).   Thereafter, in early August 2017, Deputy Attorney General Rosenstein clarified the authorized scope of the Special Counsel's investigation in the Memo.   *Id.*   At the time, no portion of the Rosenstein Memo was public.

Soon after the Special Counsel's appointment, the scope of his investigation became the subject of attention from members of Congress, the press, and the public at large.   In early 2018, for example, after the Rosenstein Memo was filed in this case with only the portion related to Mr. Manafort unredacted, members of Congress requested a copy of the Memo to understand the potential scope of the Special Counsel's anticipated future report.   *See id.* at 1–2; *see also* Attachment C to Government's Response in Opp. to Mot. to Dismiss, *United States v. Manafort*, No. 18-cr-00083 (E.D. Va. Apr. 10, 2018), ECF No. 32-4.   Despite the widespread, "keen interest"

5

in the investigation, the Justice Department declined to any make any additional portion of the Memo public in 2018, because the "criminal investigations" described in it were then "ongoing." Ex. 6 (Watson) at 2 (quoting April 30, 2018 letter from Assistant Attorney General Stephen Boyd to members of Congress).

The Special Counsel's investigation concluded with the submission of a confidential report (the "Mueller Report" or "Report") in March 2019, which was first made public in redacted form on April 18, 2019. Ex. 7 (Shane Harris, Ellen Nakashima & Craig Timberg, *Through Email Leaks and Propaganda, Russians Sought to Elect Trump, Mueller Finds*, Wash. Post (Apr. 18, 2019), https://www.washingtonpost.com/politics/through-email-leaks-and-propaganda-russians-sought-to-elect-trump-mueller-finds/2019/04/18/109ddf74-571b-11e9-814f-e2f46684196e_story.html ("Harris, Nakashima & Timberg")); *see also* Ex. 8 (Letter from Attorney Gen. William P. Barr to Sen. Lindsey Graham, Rep. Jerrold Nadler, Sen. Dianne Feinstein, and Rep. Doug Collins (Mar. 24, 2019), https://www.washingtonpost.com/context/read-attorney-general-barr-s-principal-conclusions-of-the-mueller-report/218b8095-c5e3-4eab-9135-4170f5b3e87f/) at 1 (announcing the Attorney General's "summar[y]" of the Special Counsel's "principal conclusions" before the redacted Report was released). But for over a year after the Report's first public release, no additional portions of the Rosenstein Memo were disclosed. Only in May 2020 did the Department of Justice release a second, less-redacted version of the Rosenstein Memo. In part, the letter enclosing the Memo states that "the Attorney General . . . determined that it [was] . . . in the public interest to release . . . [an] unclassified version of the . . . Memo with limited redactions to protect national security interests." Ex. 4 (Boyd Letter) at 1. Today—more than five years after the Special Counsel submitted his Report—those limited redactions to the unclassified Memo remain.

## II.     The Special Counsel's Investigation and the Grand Jury Proceeding

Elements of the Special Counsel's investigation continued after March 2019, with certain ongoing investigations transferred to U.S. Attorneys' Offices. *See* Ex. 9 (Katelyn Polantz, Evan Perez & Jeremy Herb, *Exclusive: Feds Chased Suspected Foreign Link to Trump's 2016 Campaign Cash for Three Years*, CNN (Oct. 14, 2020), https://www.cnn.com/2020/10/14/politics/trump-campaign-donation-investigation/index.html ("Polantz, Perez & Herb")); *see also* Special Counsel Robert S. Mueller III, U.S. Dep't of Justice, Report on the Investigation into Russian Interference in the 2016 Presidential Election, App. D at D-1–D-3 (Mar. 2019).[3]  One such spun-out investigation, which was referred to the USAO-DC, was of a "[f]oreign campaign contribution." *Id.*

Details about that investigation first began to emerge publicly in 2018 when a "Corporation" owned by a foreign nation—referred to in some public filings as "Country A"—refused to comply with a grand jury subpoena. *See In re Grand Jury Subpoena*, 749 F. App'x 1, 2 (D.C. Cir. 2018).  The government initiated contempt proceedings in the U.S. District Court for the District of Columbia, which the Corporation, arguing it was entitled to invoke Country A's sovereign immunity, fought all the way to the Supreme Court. *See id.*; *see also, e.g.*, Petition for Writ of Certiorari, *In re Grand Jury Subpoena*, No. 18-948 (U.S. Jan. 7, 2019); *In re Grand Jury Subpoena*, 139 S. Ct. 1378 (2019) (mem.).  The district court held the Corporation in contempt,

---

[3] Citations to the Special Counsel's Report are to the version obtained by Jason Leopold, then of BuzzFeed News, in November 2020. *See Updated Mueller Report – Leopold FOIA (11.2.20)*, DocumentCloud, https://www.documentcloud.org/documents/20401632-updated-mueller-report-leopold-foia-11220; *see also* Ex. 10 (Jason Leopold & Ken Bensinger, *New: Mueller Investigated Julian Assange, WikiLeaks, and Roger Stone for DNC Hacks*, Buzzfeed (Nov. 3, 2020), https://www.buzzfeednews.com/article/jasonleopold/new-mueller-investigated-julian-assange-wikileaks-and-roger ("Leopold & Bensinger")) at 2 (referencing "newly released portions of the Mueller report").

imposing a fixed monetary penalty that "increase[d] each day the Corporation fail[ed] to comply"; the D.C. Circuit affirmed that order. *In re Grand Jury Subpoena*, 749 F. App'x at 2. The Supreme Court declined review. *In re Grand Jury Subpoena*, 139 S. Ct. at 1378.

The Corporation's (ultimately unsuccessful) subpoena battle attracted extensive media attention. *See, e.g.*, Ex. 11 (Darren Samuelsohn & Josh Gerstein, *Reporters Shooed Away as Mystery Mueller Subpoena Fight Rages On*, Politico (Dec. 14, 2018), https://www.politico.com/story/2018/12/14/mystery-mueller-subpoena-fight-1065409). And, as the case wound its way through the courts, the Reporters Committee filed applications in all three levels of the federal judiciary to reveal more information to the public. On January 9, 2019, the Reporters Committee moved to unseal in the D.C. Circuit and the Supreme Court. *See* Motion to Unseal, *In re Grand Jury Subpoena*, Nos. 18A669 & 18M93 (U.S. Jan. 9, 2019); Motion to Unseal, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Jan. 9, 2019), ECF No. 1767730. And on February 1, 2019, the D.C. Circuit granted the Corporation's motion for leave to publicly file its sealed January 16, 2019 brief responding to the Reporters Committee's motion. *See* Order, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Feb. 1, 2019), ECF No. 1771648. Because that filing made the identity of the Corporation's counsel at Alston & Bird LLP public, the government recognized that its arguments against revealing that same information on the Supreme Court docket were moot, permitting that information to again be filed publicly. *See* Letter of Noel J. Francisco, U.S. Solicitor Gen., to Hon. Scott S. Harris, *In re Grand Jury Subpoena*, No. 18-948 (U.S. Feb. 4, 2019). The D.C. Circuit granted the Reporters Committee's unsealing motion in part. Accordingly, it required the Government to publicly file briefs, a transcript, and certain other documents in that appeal, while applying only the limited redactions still required—including to the identity of the Corporation and Country A—because, for instance, "the grand jury investigation

8

[was] ongoing." *See* Order at 1, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. June 7, 2019), ECF No. 1791658; *see also* Order, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Apr. 23, 2019), ECF No. 1784227.

Following a hearing on March 27, 2019, then-Chief Judge Howell of the District Court for the District of Columbia partly granted the Reporters Committee's motion to unseal that had been filed in her court, though the identity of the Corporation and "any matters occurring before the grand jury" were to remain redacted while "the need for secrecy [was] heightened during [the] ongoing investigation." Order at 10–11, *In re Grand Jury Subpoena No. 7409*, No. 18-gj-41 (D.D.C. Apr. 1, 2019), ECF No. 116. Indeed, at the time of that hearing, counsel for the government represented to the district court that the investigation that led to the issuance of the subpoena to the Corporation owned by Country A was "continuing robustly." Hr'g Tr. at 11:22–12:1, 17:6–9, *In re Grand Jury Subpoena No. 7409*, No. 18-gj-41 (D.D.C. Mar. 27, 2019), ECF No. 113.

Earlier this year, on or around June 20, 2024, the District Court for the District of Columbia ordered the unsealing of less-redacted versions of court rulings issued in the contempt proceeding—orders that were originally sealed in their entirety and made public with more extensive redactions as a result of the district court's 2019 order partially granting the Reporters Committee's motion to unseal. These more lightly redacted judicial records shed additional light on the contempt proceeding and the underlying investigation that spurred it. Government Status Report, *In re Grand Jury Subpoena No. 7409*, No. 18-gj-41 (D.D.C. June 14, 2024), ECF No. 139. The less-redacted judicial records revealed, among other things, that the Corporation's personnel were located in Cairo, Egypt. Mem. Op., *In re Grand Jury Subpoena No. 7409*, No. 18-gj-41 (D.D.C. Sept. 19, 2018), ECF No. 139-1 at 4 & n.3.

9

### III.   Public Access to the Special Counsel's Report and the Rosenstein Memo

In the years since the Special Counsel's investigation ended, significantly more information about its scope and findings has come to light. The Mueller Report itself was released in redacted form on April 18, 2019, and the Department of Justice released two more versions with successively fewer redactions on June 19 and November 2, 2020, respectively. *See* Ex. 7 (Harris, Nakashima & Timberg); Compl. ¶ 1, *Leopold v. U.S. Dep't of Justice*, No. 19-cv-957 (D.D.C. Apr. 4, 2019); Ex. 12 (Devlin Barrett, *Mueller's Team Contemplated Whether Trump Had Lied to Them, Newly Disclosed Sections of Report Show*, Wash. Post (June 19, 2020), https://www.washingtonpost.com/national-security/mueller-report-redactions-trump-roger-stone/2020/06/19/ff3a9c16-b283-11ea-856d-5054296735e5_story.html); Ex. 10 (Leopold & Bensinger) at 4. Around the same time, the less-redacted Rosenstein Memo was released, giving the public further insight into the Special Counsel's areas of inquiry. *See supra* pp. 5–6. By and large, these publicly released documents focus on the Russia portion of the Special Counsel's investigation and potential obstruction of justice charges.

### IV.   Reporting on the Egypt Investigation

Information concerning the Egypt investigation has emerged on a different timeline. The Egypt investigation was still ongoing when the redacted Mueller Report and Rosenstein Memo were released, meaning most references to Egypt were likely to be redacted. *But see* Special Counsel Robert S. Mueller III, U.S. Dep't of Justice, Report on the Investigation into Russian Interference in the 2016 Presidential Election, Vol. I at 92, 107–08, 167–68, 195 (Mar. 2019) (passing references to Egypt). Nonetheless, additional information has come to light. In October 2020, for example, CNN published an article detailing a number of previously unknown facts about the investigation underlying the contempt proceeding against the Corporation, including that

10

the Corporation was an "Egyptian state-owned bank." *See* Ex. 9 (Polantz, Perez & Herb) at 1. And in early August 2024, the Post published an extended article based on dozens of interviews and a review of "thousands of pages of government records, including sealed court filings and exhibits," that provides the most in-depth look yet at the investigation. Ex. 1 (Davis & Leonnig) at 3. Other news outlets, including *The New York Times*, have followed suit. *See* Ex. 3 (Schmidt, Goldman & Thrush) at 3–5 (discussing investigators' related interest in Trump campaign advisor Walid Phares).

Among other things, the Post's recent reporting explains that an organization linked to the Egyptian intelligence service withdrew $9,998,000 in cash from the National Bank of Egypt around the time the Trump campaign was "running low on funds." Ex. 1 (Davis & Leonnig) at 1, 5–6. The money—in $100 bills, stowed in two large bags—was then removed from the bank by two men associated with the account and their associates. *Id.* at 6; *see also* Ex. 3 (Schmidt, Goldman & Thrush) at 3 (noting that this reported withdrawal was also confirmed to *The New York Times* by a person briefed on the investigation). The Post reported that the discovery of these withdrawals by U.S. investigators, which occurred in early 2019, "intensified a secret criminal investigation" that "beg[a]n . . . with classified U.S. intelligence indicating that Egyptian President Abdel Fatah El-Sisi sought to give Trump $10 million to boost his 2016 presidential campaign." Ex. 1 (Davis & Leonnig) at 1; *see also* Ex. 3 (Schmidt, Goldman & Thrush) at 4 (explaining that "in the eyes of some agents and prosecutors working on Mr. Mueller's team, the intelligence about Egypt was far firmer than anything they had related to Mr. Trump and Russia").

According to the Post and additional reporting from *The New York Times*, the Justice Department spent years—beginning shortly after the election in 2016—"examining whether money moved from Cairo to Trump, potentially violating federal law that bans U.S. candidates

from taking foreign funds." Ex. 1 (Davis & Leonnig) at 1; *see also* Ex. 3 (Schmidt, Goldman & Thrush) at 3. Investigators also explored whether Trump's injection of $10 million of his own money into his campaign in October 2016 was linked to the cash withdrawal in Egypt. Ex. 1 (Davis & Leonnig) at 1, 4. One possibility, according to reporting by *The New York Times*, was that a Trump campaign adviser named Walid Phares "act[ed] as 'a bag man.'" Ex. 3 (Schmidt, Goldman & Thrush) at 1; *see also id.* at 3 (noting the government expended "significant resources" investigating Mr. Phares and identifying "potentially corroborating evidence" that the Egyptian government had doubted whether Phares could be trusted with the delivery). The Post's article also notes that during the Trump administration, United States' foreign policy toward Egypt shifted. Ex. 1 (Davis & Leonnig) at 3 (reporting, *inter alia*, that the State Department "released $195 million in military aid [to Egypt] that the United States had been withholding over human rights abuses" and sent an additional $1.2 billion in such aid).

The Post's article includes never-before-reported details about the investigation, including the trail the money took after leaving Egypt, and it connects the Egypt investigation to the contempt proceedings that played out in federal court in D.C., recounting the day that "senior judges closed a part of the federal courthouse in D.C. to hide the identities of the parties in a hearing . . . involving a state-owned foreign corporation." *Id.* The article also describes the Trump administration's oversight of this "politically sensitive" investigation—including the involvement of then-Attorney General William Barr, *id.* at 9, which continued beyond the President's threats to fire the Special Counsel and the President "drawing a red line around his personal finances." Ex. 3 (Schmidt, Goldman & Thrush) at 4; *see also* Ex. 1 (Davis & Leonnig) at 4 ("Trump's attorney general did not order the case closed, according to multiple people with knowledge of the events, but his instructions to [the U.S. Attorney for the District of Columbia] and, later, his selections to replace

12

her, helped steer it to that end."). According to the Post, investigators had "pressed" Jessie Liu, the U.S. Attorney for the District of Columbia, to authorize a subpoena for then-President Trump's 2017 bank records—records that could show whether the Egyptian money ever reached the President. Ex. 1 (Davis & Leonnig) at 9. But the Post reports that while Liu "indicated she was open to a subpoena seeking a limited amount of additional Trump bank records" in June 2019, she later "expressed hesitancy" about this step after speaking to Attorney General Barr. *Id.*; *see also* Ex. 3 (Schmidt, Goldman & Thrush) at 4 ("Some investigators wanted to continue digging, but Mr. Mueller stopped short of seeking the records from when Mr. Trump took office, leaving some investigators disappointed."). In January 2020, Liu was ordered to step down as U.S. Attorney, replaced first by one close ally of Barr's, then by another. Ex. 1 (Davis & Leonnig) at 11. On June 7, 2020, Michael Sherwin, the third and final U.S. Attorney for the District of Columbia to oversee the investigation, sent an email announcing his decision to "clos[e]" the "Egypt Investigation." *Id.* at 11–12.

Representatives of the Egyptian government and former President Trump, as well as one of the former U.S. Attorneys involved in the investigation, all spoke to the Post on the record. Taken together, their statements both confirm the investigation occurred and that it had been closed with no charges being brought. The director of the Egyptian government's Foreign Press Center "emphasized that the Justice Department had closed the investigation without charges." *Id.* at 2. A Trump spokesperson confirmed the investigation, while claiming that "[n]one of the allegations or insinuations being reported on have any basis in fact." *Id.* And Sherwin, for his part, told the Post that "[t]he case was closed without prejudice" and defended his decision to close it. *Id.* at 3, 12.

13

The Post's August 2024 reporting has prompted a new wave of interest in the Egypt investigation.  In early September 2024, citing the Post's reporting, members of the "House Oversight Committee released a letter . . . asking former president Donald Trump if he ever illegally received money from the government of Egypt, and whether money from Cairo played a role in a $10 million infusion into his 2016 run for president." Ex. 2 (Leonnig & Davis) at 1.  But as the Post has reported, the letter's signatories, as members of the congressional minority, lack subpoena power.  *Id.*  If former President Trump declines to comply with the letter's requests, the signatories thus cannot compel a response, *id.*, despite the strong public interest in learning more about a past president's—and current presidential candidate's—possible ties to a foreign government.

## ARGUMENT

### I.    The Court Should Grant the Media Intervenors' Motion to Intervene.

Motions to intervene for the limited purpose of seeking an order unsealing judicial records are routinely granted, including in this Circuit.  *See Doe v. Pub. Citizen*, 749 F.3d 246, 262 (4th Cir. 2014) (collecting cases).[4]  And although the "Fourth Circuit . . . has not identified the exact mechanism for doing so in [a] district court," *United States v. Bas*, 2022 WL 1270841, at *1 (D. Md. Apr. 28, 2022), numerous courts have concluded that intervention is "the most appropriate procedural mechanism" for members of the public to vindicate their right to access court records,

---

[4]    *See, e.g., Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.*, 2021 WL 168458, at *2 (D. Md. Jan. 19, 2021) ("The United States Court of Appeals for the Fourth Circuit has previously permitted news organizations to intervene in actions for the limited purpose of challenging a court's sealing orders."); *United States v. Petraeus*, 2015 WL 3606028, at *2 (W.D.N.C. June 8, 2015) (granting Reporters Committee's motion to intervene and unseal); *United States v. Matthews*, 2008 WL 5210706, at *1 (E.D. Va. Dec. 12, 2008) (granting motion to intervene under Rule 24 but denying motion to unseal); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 252 (4th Cir. 1988) (grant the Post's "motion for leave to intervene as a party appellant for th[e] limited purpose" of "unsealing the summary judgment pleadings").

*In re Associated Press*, 162 F.3d 503, 507 (7th Cir. 1998); *see also Rosenfeld v. Montgomery Cnty. Pub. Sch.*, 25 F. App'x 123, 131 (4th Cir. 2001) ("[T]he press has standing to intervene in actions in which it is not otherwise a party to seek review of a district court's order sealing documents and court records.").

Indeed, courts have recognized that journalists and news agencies may properly intervene as of right and permissively.[5]  A journalist or "a news agency has a legal interest in challenging a confidentiality order" that satisfies Rule 24(a)'s need for "an interest relating to the property or transaction [that] is the subject of the underlying action." *Ford v. City of Huntsville*, 242 F.3d 235, 239–40 (5th Cir. 2001).  That interest is "not adequately protected by existing parties to the litigation." *Hill Phoenix, Inc. v. Systematic Refrigeration, Inc.*, 117 F. Supp. 2d 508, 514 (E.D. Va. 2000); *see also BP Expl. & Prod., Inc. v. Claimant ID 100246928*, 920 F.3d 209, 211 (5th Cir. 2019) ("Most litigants have no incentive to protect the public's right of access.").  In addition, "despite the lack of a clear fit with the literal terms of Rule 24(b) [of the Federal Rules of Civil Procedure], every circuit court that has considered the question has come to the conclusion that nonparties may permissively intervene for the purpose of challenging confidentiality orders." *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998).

Intervention should be granted here.  In this case, both parties seeking to intervene have not only a right to the material under the First Amendment and common law, but also a long history of litigating these types of matters in general and a keen interest in the sealed material here in

---

[5]  Under Rule 24(b)(1)(B), "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." And under Rule 24(a)(2), "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

particular.  For example, the Reporters Committee initiated litigation seeking to unseal other Mueller-related documents five years ago and succeeding in doing so after litigating in all levels of the Federal Courts.  *See, e.g., In re Grand Jury Subpoena No. 7409*, 19-gj-41, (D.D.C. Apr. 1, 2019), ECF No. 116 (opinion granting in part and denying in part the Reporters Committee's motion to unseal certain material related to secrete contempt proceedings).  And the Post has been at the forefront of reporting on the Mueller investigation from the investigation's inception.  In fact, the Post's recent reporting is what catalyzed the Reporters Committee and the Post's filing here.  Accordingly, given this Court's longstanding practice, the interests of the Reporters Committee and the Post, their entitlement to the material, and their prompt filing of this Motion, intervention should be granted.

**II.    The First Amendment and Common Law Rights of Access Require Unsealing of the Rosenstein Memo.**

Public access serves many salutary ends.  One such end is oversight and accountability. *See, e.g., In re Washington Post Co.*, 807 F.2d 383, 389 (4th Cir. 1986) ("[P]ublic access . . . discourag[es] either the prosecutor or the court from engaging in arbitrary or wrongful conduct."). Another is legitimacy. *See, e.g., Press-Enter. Co. v. Superior Ct. of California*, 464 U.S. 501, 508, (1984) ("Openness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.").  Those ends are rarely more important to secure than they are in this case.  Based on the Post's reporting, the Egypt investigation involved matters of grave and momentous national concern:  a foreign nation's potential bribery of, and illegal campaign contributions to, a presidential candidate who became president and who is running for that office again, and a failure of the Justice Department to follow the evidence wherever it led regarding these matters.  In short, given these possibilities, there is an overwhelming public interest in the fullest amount of disclosure possible here.

16

"It is well settled that the public and press have a qualified" First Amendment and common law "right of access to judicial documents and records filed in civil and criminal proceedings." *Doe*, 749 F.3d at 265. "The common-law presumptive right of access extends to all judicial documents and records." *Id.* at 265–66; *see also In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290–91 (4th Cir. 2013) (holding that "documents filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights"). "By contrast, the First Amendment secures a right of access 'only to particular judicial records and documents.'" *Doe*, 749 F.3d at 266 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988)). Regardless of which right applies, it "may be abrogated only in unusual circumstances." *Id.* at 265 (citation omitted).

Both the constitutional and common law presumptions of public access apply to the Rosenstein Memo. "A First Amendment right of access applies to a criminal trial." *In re Time Inc.*, 182 F.3d 270, 271 (4th Cir. 1999); *accord United States v. Doe*, 962 F.3d 139, 145 (4th Cir. 2020). That constitutional right extends to "certain . . . pretrial proceedings and filings," including documents, like the Memo, "filed with . . . motions to dismiss the indictment." *In re Time Inc.*, 182 F.3d at 271. Here, "[i]n the course of the [Court's] hearing on defendant's motion to dismiss the Superseding Indictment[,]" the Court ordered the Government "to produce an un-redacted copy of the August 2 Scope Memorandum," *United States v. Manafort*, 321 F. Supp. 3d 640, 648 n.14 (E.D. Va. 2018); *United States v. Manafort*, No. 18-cr-00083 (E.D. Va. May 4, 2018), ECF No. 52. The Government, in compliance with that order, filed the unredacted Memo under seal on May 17, 2018. *United States v. Manafort*, No. 18-cr-00083 (E.D. Va. May 17, 2018), ECF No. 71. And while the Court's review of the Memo ultimately allowed it to conclude "that the only portions pertinent to the issues in th[e] case [we]re those already available in this public record,"

17

the Court necessarily considered the entirety of that document when reaching that conclusion. *United States v. Manafort*, 321 F. Supp. 3d at 648 n.14; ECF No. 52; *cf. Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123 (2d. Cir. 2006) (rejecting argument that the weight of the common law presumption of public access to judicial records submitted in connection with a motion differed "based on the extent to which they were relied upon in resolving the motion"); *United States v. Hubbard*, 650 F.2d 293, 316 (D.C. Cir. 1980) (documents that were the subject of a motion to suppress were judicial records to which the common law presumption of public access applied notwithstanding that their "only relevance to the proceedings derived from the defendants' contention that many of them were *not* relevant to the proceedings, *i.e.*, that the seizure exceeded the scope of the warrant" (emphasis added)).  Accordingly, because the Memo was filed under seal in connection with the Court's consideration of Mr. Manafort's "motion[] to dismiss the indictment," *In re Time Inc.*, 182 F.3d at 271, and "play[ed] a role in [that] adjudicative process," *In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d at 290, it is a judicial record to which both the common law and First Amendment presumptions of public access apply.

Where, as here, the qualified right of access under the First Amendment applies, it may be overcome "on the basis of a compelling governmental interest"—albeit "only if the denial [of access] is narrowly tailored to serve that interest." *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004) (citation omitted); *see In re Wash. Post Co.*, 807 F.2d at 392. Similarly, "[t]he common-law presumptive right of access . . . can be rebutted only by showing that 'countervailing interests heavily outweigh the public interests in access.'" *Doe*, 749 F.3d at 265–66 (quoting *Rushford*, 846 F.2d at 253); *see Va. Dep't of State Police*, 386 F.3d at 575 (listing factors courts consider).  Continued sealing of the redacted portions of the Memo would serve no

18

compelling interest. And, for substantially the same reasons, no countervailing interests outweigh the public interest in access here.

First, there is no conceivable prejudice to Mr. Manafort. The Memo outlines the authority of the Special Counsel and the scope of his investigation, and those portions of the Memo pertaining to Mr. Manafort, specifically, have long been public. *See* Ex. 4 (Boyd Letter) (attaching redacted Rosenstein Memo); *see also United States v. Manafort*, 321 F. Supp. 3d at 648 n.14 ("[A] review of the un-redacted memorandum confirms that the only portions pertinent to . . . this case are . . . already available in this public record . . ."); *United States v. Manafort*, No. 18-cr-00083 (E.D. Va. May 4, 2018), ECF No. 52. Because Mr. Manafort—who is not mentioned in the Post's reporting—was convicted, sentenced, and has now been pardoned, he has no countervailing interest to assert in support of continued sealing of the still-redacted portion of the Memo that was filed in this case.

Second, the information that remains redacted in the Rosenstein Memo—which, in view of the unredacted portions of the Memo and what is known about the Mueller investigation, almost certainly concern the Egypt investigation—has, for all intents and purposes, lost any secret characteristic it may once have had. "As [the Fourth Circuit] ha[s] recognized in a slightly different context, '[o]nce announced to the world,'" secret "information [can] los[e] its secret characteristic." *Va. Dep't of State Police*, 386 F.3d at 579 (quoting *In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990)). That has occurred here. Although the Egypt branch of the Special Counsel's inquiry was once understandably secret, it has now been publicly revealed—directly and indirectly—through court filings (in response to the Reporters Committee's earlier unsealing efforts) and press reports (including the Post's recent, extensive reporting).

Indeed, the Post's reporting included on-the-record statements about the investigation from the relevant parties. A spokesperson for Donald Trump, Steven Cheung, told the Post that "[t]he investigation referenced"—*i.e.*, the investigation seeking to determine whether funds withdrawn from the National Bank of Egypt made their way to Trump—"found no wrongdoing and was closed." Ex. 1 (Davis & Leonnig) at 2. Michael Sherwin, a Department of Justice official, explained that he "made the . . . decision" to close the Egypt investigation and "stand[s] by it." *Id.* at 3. And Ayman Walash, the director of the Egyptian government's Foreign Press Center, "emphasized" in an email that "the Justice Department had closed the investigation without charges." *Id.* at 2. The article also provides detailed insight into the work of the Special Counsel's office. To take just a few examples, the article identifies the name of the Mueller team investigating potential links to Egypt—"Team 10" for $10 million—and explains that "Justice officials sent the case to Mueller . . . based on the theory that the Egypt allegations dovetailed with possible foreign election interference." *Id.* at 4.[6] Given these and other public disclosures, the full Memo should be unsealed because what lies beneath its redactions is no longer secret in any meaningful sense.

Third, any interests that could be asserted by the Government now in support of continued sealing—whether they be national security or investigative secrecy related—are limited. In a May 6, 2020, letter to the Senate Judiciary Committee, Assistant Attorney General Stephen Boyd explained that the remaining redactions in the unclassified Memo were in place "to protect national security interests." Ex. 4 (Boyd Letter) at 1. In an earlier letter, Assistant Attorney General Boyd cited the "ongoing" nature of the Special Counsel's investigation as a basis for withholding the

---

[6] *The New York Times* also has identified Mr. Phares as a key focus of the Egypt investigation. *See* Ex. 3 (Schmidt, Goldman & Thrush) at 3, 4.

20

Memo. Ex. 6 (Watson) at 2 (quoting April 30, 2018 letter from Assistant Attorney General Stephen Boyd to members of Congress). But those interests have almost certainly dissipated. The investigation is closed, the Post has reported extensively about the Egypt investigation, and the three parties most directly affected have all acknowledged the investigation's existence and its closure. According to Assistant Attorney General Boyd's letter, the Memo is now unclassified, and simply invoking national security, particularly given the factual circumstances here, is not sufficient to justify continued sealing. *See In re Washington Post Co.*, 807 F.2d at 392 (noting a "court may not base its decision [to seal documents in criminal proceedings] on conclusory assertions [about national security] alone, but must make specific factual findings").

Further, it is worth nothing that the current limit on access to information in the Memo pertaining to the Egypt investigation is partly an accident of timing. The special counsel regulations require a special counsel to "provide . . . [a] report explaining the prosecution or declination decisions reached by the Special Counsel." *See* 28 C.F.R. § 600.8(c). And while such reports are "confidential" upon submission, *id.*, they often become public in practice. *See, e.g.,* Independent and Special Counsel Investigations, GovInfo, https://www.govinfo.gov/collection/independent-counsel-investigations. That is hardly surprising given the nature of special counsel investigations. They often implicate a president or other high-ranking officials where public confidence is especially important. Such was the case here. Special Counsel Mueller authored a report, and most of it is now public. The Egypt branch of his investigation was, however, continuing when he submitted the Report. Had that not been the case—had the Egypt investigation concluded before March 2019—much would already be known about it, including the scope of his authority to investigate Egypt-related matters. In fact, the Mueller Report describes much of the content in the Rosenstein Memo, but omits the Egypt prong.

21

*See* Special Counsel Robert S. Mueller III, U.S. Dep't of Justice, Report on the Investigation into Russian Interference in the 2016 Presidential Election, Vol. I at 11–12 (Mar. 2019). That would almost certainly not have been the case if the investigation had ended before Special Counsel Mueller submitted his report.

Against the lack of any compelling, countervailing interests in support of continued sealing are the obvious and profound benefits of disclosure. The "sealed document[] in this case implicate[s] public concerns that are at the core of the interests protected by the right of access: the citizen's desire to keep a watchful eye on the workings of public agencies" and "the operation of the government." *Doe*, 749 F.3d at 271 (quotation marks omitted). In cases such as these, where the "public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch[,]" the public's interest in access is at its apex. *Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987); *see also Doe*, 749 F.3d at 271.

The above-captioned criminal prosecution of Mr. Manafort arose out of the Special Counsel's investigation and—because portions of the Memo remain hidden from public view—the scope of that investigation, as authorized by then-Deputy Attorney General Rod Rosenstein, still is not public. *See, e.g.*, *Washington Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991) (describing the public "as overseer of the criminal justice process"). And, with respect to the Egypt prong of the investigation, in particular, the Post's reporting indicates that prosecutors could have sought, but declined to seek, then-President Trump's bank records, even though such evidence would have been central to determining whether or not he received approximately $10 million from Egypt, before the investigation was closed in 2020. Because records—including portions of the Memo—relating to the Egypt investigation remain sealed or redacted, the public does not know

the parameters of what the Special Counsel was authorized to investigate, and what was handed over to the USAO-DC after the Mueller investigation ended.  Such continued secrecy undermines perhaps the most important benefit of public access: the legitimacy of our democratic institutions. *See, e.g., Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991) (explaining that public access "enhances both the basic fairness of the criminal [proceeding] and the appearance of fairness so essential to public confidence in the system" (alteration in original) (quoting *Oregonian Pub. Co. v. United States Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990))).  And it does so at exactly the wrong time—on the eve of a presidential election involving former President Trump.  Particularly given the heightened public interest in access to the unredacted Rosenstein Memo, Media Intervenors' constitutional and common law rights of access cannot be overcome.

## CONCLUSION

For the foregoing reasons, the Reporters Committee and the Post respectfully request that the Court grant their motion to intervene and enter an order unsealing the Rosenstein Memo in its entirety, or, in alternative, unsealing of those portions of the Memo pertaining to the Egypt investigation.

23

September 13, 2024

Respectfully submitted,

_____
Katherine Maddox Davis, Virginia Bar No. 89104
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-4504
Phone: 202.955.8587
Facsimile: 202.831.6038
KDavis@gibsondunn.com

Katie Townsend (*pro hac vice* forthcoming)
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
ktownsend@rcfp.org

Theodore J. Boutrous Jr. (*pro hac vice*
forthcoming)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Phone: 213.229.7000
Facsimile: 213.229.6804
TBoutrous@gibsondunn.com

Lee R. Crain (*pro hac vice* forthcoming)
H. Chase Weidner (*pro hac vice* forthcoming)
Megan R. Murphy (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone: 212.351.2454
Facsimile: 212.817.9454
LCrain@gibsondunn.com
CWeidner@gibsondunn.com
MMurphy2@gibsondunn.com

*Counsel for Movants The Reporters Committee for
Freedom of the Press and The Washington Post*